UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| STATE OF CONNECTICUT | December 6, 2021 |
|---|---|
| COUNTY OF HARTFORD | **FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Christopher Mehring, being first duly sworn, hereby depose and state as follows:

1.     I am a Special Agent with the Defense Criminal Investigative Service (DCIS) of the United States Department of Defense, Office of Inspector General, and have been since 2002. During that time, I have worked in the New Haven office and conducted investigations primarily in complex white collar matters, in the areas of procurement fraud, health care fraud, computer intrusion, corporate conspiracies (including theft of trade secrets and counterfeit goods), and antitrust. I received a Bachelor's Degree in criminal justice from Northeastern University in 1996 and a Master's Degree in business administration from the University of Delaware in 1998. During my time with DCIS, I have served on the FBI's Computer Crimes Task Force. Prior to joining DCIS, I was a United States Immigration Officer for the United States Immigration and Naturalization Service.

2.     I submit this affidavit in support of a criminal complaint and arrest warrant for Mahesh Patel ("PATEL"), for violation of section 1, Title 15, United States Code (the Sherman Act). Based on the facts set forth below in this affidavit, there is probable cause to believe, and I so believe, that PATEL has violated the above-referenced criminal statute. The elements needed to establish a criminal violation of this statute are: (i) a conspiracy existed between two or more competitors to unreasonably restrain trade (that is, to fix prices, rig bids, or allocate markets, all of which are *per se* unreasonable restraints of trade); (ii) the defendant knowingly joined the

conspiracy; and (iii) the conspiracy involved interstate trade or commerce (or certain types of

international trade and commerce, not relevant here).

3.    The information contained in this affidavit is based upon the investigation to date,

which includes, but is not limited to, subpoenaed grand jury records; grand jury testimony;

interviews with cooperating witnesses, subject and other percipient witnesses, and victims of the

crime; my personal knowledge and involvement in the investigation; official records checks and

public records checks; my training and experience as a criminal investigator; and my

conversations with other law enforcement officers and investigators. Because this affidavit is

submitted for the limited purpose of establishing probable cause for the requested criminal

complaint and arrest warrant, I have not included each and every fact known to me concerning

this investigation. Rather, I have set forth herein only those facts that I believe are necessary to

establish probable cause to support the criminal complaint and arrest warrant requested herein.

## INVESTIGATION TO DATE

4.    The facts set forth below are accurate as of the time period relevant to this

investigation, approximately 2011 to 2019.

### Background on PATEL and the Market

5.    Company A was a subsidiary of a parent company and one of the largest

aerospace engine design, manufacture, and service companies in the United States. Company A

relied upon different sources of labor to design, manufacture, and service its aerospace products,

including through outsource engineering. In an outsource arrangement, an outsource engineering

supply company ("Supplier") entered into an agreement with Company A to complete a

particular project, often referred to as a Statement of Work. The Supplier then assigned engineers

and other skilled workers from among its own employees to complete that project, and then received an agreed-upon payment from Company A for such work.

6.      Companies B through F, described below, were among the Suppliers whose employees worked on projects for Company A on an outsource basis. Together with Company A, these companies competed against one another to recruit and hire engineers and other skilled workers. As Suppliers, they also competed against one another for outsource work projects from Company A, including on the basis of (low) price.

a.      Company B was an Ohio corporation with a principal place of business in East Hartford, Connecticut.

b.      Company C was an Ohio corporation with a principal place of business in Windsor, Connecticut.

c.      Company D was a California corporation with a principal place of business in East Hartford, Connecticut. Prior to 2014, Company D was known under a different corporate name.

d.      Company E was a Florida corporation with a principal place of business in Jupiter, Florida.

e.      Company F was a Florida corporation with a principal place of business in Palm Beach Gardens, Florida.

7.      PATEL is a U.S. citizen who currently resides in Glastonbury, Connecticut. Beginning in 2003, he was the Manager and (later) Director of the unit within Company A in charge of managing the relationship between Company A and its Suppliers. Within that unit, he was the highest-ranking employee and managed a team of associates from his office in East Hartford, Connecticut. PATEL and his associates frequently communicated with representatives

3

of the Suppliers, controlled the statements of work and payments for Supplier projects, and monitored the quality of Supplier work and progress on their projects for Company A. PATEL was also involved in master contract negotiations between Suppliers and Company A's parent company, which provided for maximum pricing for each Supplier to Company A. PATEL left Company A in March 2020.

8.      Co-Conspirators 1–8, described below, were managers or executives at Suppliers that performed work on Company A projects. Each had substantial responsibilities on behalf of his respective corporation to maintain and advance his employer's business relationship with Company A, and substantial responsibilities with respect to the management of hiring and recruiting at his respective company. Each had communications with PATEL on those subjects.

        a.      Beginning in 2010, Co-Conspirator 1 was employed by Company B as Senior Vice President, then President-Strategic Accounts, and, as of 2019, President-Global Business Head, and worked principally from an office in East Hartford, Connecticut.

        b.      Beginning at least as early as 2007, Co-Conspirator 2 was employed by Company B. He served as Engineering Director, General Manager starting in 2011, and in 2015, Associate Vice President, and worked principally from an office in East Hartford, Connecticut.

        c.      Beginning in early 2015, Co-Conspirator 3 was Vice President/Strategic Client Partner of Company B, and worked principally from offices in East Hartford, Connecticut and Tokyo, Japan. He left Company B in early 2021.

        d.      Beginning in late 2015, Co-Conspirator 4 was employed by Company B as a General Manager and, as of 2018, Chief Engineer/Account Manager, and worked principally from offices in East Hartford and Windsor, Connecticut. He left Company B in 2020.

e.      Beginning in early 2013, Co-Conspirator 5 was employed by Company C as a General Manager, Vice President, and, as of 2019, Senior Vice President, and worked principally from an office in Windsor, Connecticut.

f.      Beginning in or around 2010, Co-Conspirator 6 was employed at Company D, and as of around 2013, has been President for Company D's North America operations. He worked principally from an office in East Hartford, Connecticut.

g.      Beginning at least as early as 2015, Co-Conspirator 7 was Chief Operating Officer/Executive Vice President and part owner of Company E, and worked principally from an office in Jupiter, Florida.

h.      Beginning in 1993, Co-Conspirator 8 founded and was part owner of Company F, and also served as President and Chief Executive Officer. He worked principally from an office in Palm Beach Gardens, Florida.

9.      Certain other individuals who participated in or otherwise have knowledge of the conspiracy have provided information to me and other investigators in the course of this investigation.

a.      Individual 1 █████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████.

b.      Individual 2 █████████████████████████████████
████████████████████████████████████████████████████
███████████████

c.  Individual 3 

d.  Individual 4

e.  Individual 5

f.  Individual 6

10.  Increases in labor costs due to increased wages or benefits to engineers and other skilled workers affected both the Suppliers and Company A. If a Supplier increased wages or benefits, including as a means of attracting and retaining workers, that Supplier's total labor costs increased. This resulting increase in labor costs may have financially motivated the Supplier to quote or seek to charge higher prices (or "rates") to Company A, given that a Supplier's rate for its work on a particular Company A project was based primarily on per-hour prices for the labor to be performed by the Supplier's employees. Labor costs were thus closely monitored by each of the Suppliers and by PATEL on behalf of Company A; Companies A–F each had an interest in minimizing or reducing labor cost increases.

### The Agreement

11.     Beginning at least as early as 2011 and continuing until as late as September 2019, PATEL and others, including, over the course of the conspiracy, Co-Conspirators 1–8 and Companies A–F, agreed to allocate victim-employees in the labor market in the aerospace industry working on projects for Company A, specifically by agreeing to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among Companies A–F in the United States. Furthermore, PATEL served as a leader and primary enforcer of this agreement.

12.     The agreement described in Paragraph 11 manifested itself in interwoven and overlapping hiring and recruiting restrictions, with PATEL serving as a central player. As the evidence shows, these restrictions had a common purpose—to limit competition for, and thus restrict the free movement of, victim-employees within the outsource aerospace engineering industry—and thus artificially prolonged victim-employees' tenures at their existing employers and eliminated or reduced their ability to negotiate the terms of their current or future employment. Furthermore, these restrictions were shaped by the conspirators' shared financial motivations, namely, to reduce labor costs and suppress wages. Some of these hiring and recruiting restrictions are discussed in more detail below.

### Restricting Hiring and Recruiting Between Suppliers

13.     PATEL participated in an agreement between Companies B through F not to recruit and hire each other's employees, with the aid of several of their managers and executives, including Co-Conspirators 1–8. PATEL served as a leader and chief enforcer of the agreement between and among the Suppliers, due to his position and influence at Company A, their common customer.

14.     The origin of this agreement lies in the common interest of Suppliers and Company A to restrict the movement of employees from Supplier to Supplier, including as a wage-suppression strategy. Beginning as early as 2011, certain Suppliers who shared Company A as a mutual customer reached agreements to restrict the hiring and recruiting of engineers and other skilled-labor employees between and among them. For example, Individual 1 and Co-Conspirator 2 ████████████████████████████████████████████ ████████████████████████████  ████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████  ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.

15.     Around the same time, evidence shows PATEL was aligned with and actively engaged in the conspiracy. ████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████

PATEL Instructed Suppliers Not to Recruit and Hire from Each Other

16.     ██████████████████████████████  PATEL explicitly told Supplier managers and executives that Company A's Suppliers should not be recruiting and hiring each other's employees. The Suppliers, in turn, understood that these restrictions applied mutually among the Suppliers themselves.

17. ██████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████

18. ████████████████████████

████████████████████████████████████

████████████████████████████████

19. ██████████████████████████

████████████████████████████████████

████████████ This included a September 2016 email from PATEL to Co-Conspirator 7, which was subsequently forwarded to Individual 5, in which PATEL stated: "Last time we talked you assured me that you will not hire any [Company A] partners employee. This must stop, otherwise others will also start poaching your employees." ████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████

20.     In addition to communicating the rule to each Supplier individually, PATEL also communicated the rule to Companies B, C, and D while their representatives were together in the same room. In December 2015, Company A held a dinner attended by PATEL and representatives from many Company A Suppliers, including Co-Conspirator 3, Co-Conspirator 4, and Co-Conspirator 6. Individual 1, ████████████████████ sent an email to Co-Conspirator 5 and other Company C employees summarizing statements made by PATEL during

this dinner as he addressed the Supplier representatives. According to this summary, PATEL directed the attendees that there should be no poaching of each other's employees.

<u>PATEL Appealed to Conspirators' Joint Interest in Suppressing Labor Costs</u>

21.     Evidence gathered in the investigation shows that, from time to time, PATEL justified the no-hire/no-recruit agreement by appealing to the wage-suppression benefits that it provided to the conspirators, either by referring specifically to wages or salaries or, more broadly, to shared costs or prices.

22.     ██████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████
██████████████████████████████████
████████████████████████████████
██████████████████████████████████
███████████████████████████████████
████████████████████████████████████
███████████████████████████████
██████████████████████████

23.     ████████████████████████████
███████████████████████████████
██████████████████████████████████████
████████████████████

24.     PATEL repeated or referred to this financial rationale in communications with other Suppliers. For example, as shown in a January 2017 email that was shared with Co-Conspirator 7, PATEL contacted Company E after it had hired an employee of Company D and instructed "Please do not hire any partners employee, whether they approached or you approached. That is the only way we can pre[v]ent poaching and price war." Similarly, in March 2016, in the course of discussing PATEL's hiring restrictions with an executive of another Supplier, Co-Conspirator 7 wrote: "MAHESH says he does not want the salaries to increase."

25.     Suppliers, in turn, repeated this rationale back to PATEL at times. For example, in April 2017, Co-Conspirator 4 emailed PATEL complaining that Company D had hired an employee of Company B, telling him "This is against our agreements with our employees and against our known expectations of Company A for the cooperation of the outsource companies." Co-Conspirator 4 warned PATEL that if such hiring does not stop, it will "drive the price structure up." PATEL sent an invitation for a "private discussion" the next day in his office with the executives of the two competing Suppliers involved—including Co-Conspirator 4 from Company B, and Co-Conspirator 6 from Company D—as "required" attendees.

<u>PATEL Policed and Enforced the Agreement on Behalf of Co-Conspirator Suppliers</u>

26.     Evidence obtained in the investigation demonstrates that PATEL served as an intermediary between Companies B–F to police the agreement between them and enforce it against Suppliers that attempted to solicit or hire other Suppliers' employees in violation of the agreement. At times, when infractions of the agreement occurred, a Supplier alerted PATEL to the violation and requested that he assist in preventing or deterring such conduct. PATEL often responded to these requests by reprimanding the noncompliant Supplier.

27.     For example, in May 2016, a Company C Vice President (Co-Conspirator 5) was informed by a colleague that "[a]nother employee" had been hired by Company E to work on outsourcing project for a non-Company A company. The colleague asked Co-Conspirator 5 if he "ever discuss[ed] the last one with Mahesh." Co-Conspirator 5 assured the colleague that he had spoken to PATEL and that PATEL "said he'd talk to [Company E] about it." Co-Conspirator 5 subsequently emailed PATEL to complain that his company was "losing another employee to [Company E]," and named the employee. Just a few months later, a similar communication occurred in the opposite direction. In November 2016, Co-Conspirator 7 wrote an email to PATEL complaining about "[Company C] actively Recruiting [Company E] employees." PATEL forwarded Co-Conspirator 7's email to Co-Conspirator 5 and another Company C manager, saying, "[w]e must not poach each other partners employee. Please communicate to [Company C] HR not to interview or hire active employees working on Company A work."

28.     As another example, in a February 2017 email from Company B's files, Co-Conspirator 3 responded to the news that Company C had made an employment offer to a Company B engineer by stating "[Company C] is not allowed to poach any of our employees and I will plan to block this immediately. I will send this to Mahesh today." Approximately four minutes later, Co-Conspirator 3 forwarded the information about Company C's offer directly to PATEL, adding "I am very concerned that [Company C] believes they can hire any of our employees. …. Could you please stop this person from being hired by [Company C]?" Individual 2, who had informed Co-Conspirator 3 of Company C's competitive offer to this engineer, has confirmed that part of Co-Conspirator 3's responsibilities at Company B was to speak with PATEL when other Suppliers violated the no-hire/no-recruit rule.

29.     As another example, in January 2017, after Company D informed PATEL in an email that Company E had hired a Company D employee, PATEL forwarded the email from Company D to Co-Conspirator 7, stating: "Last time we talked you assured me that you will not hire any [Company A] partners employee. This must stop, otherwise others will also start poaching your employees. Please advise."

30.     The investigation indicates that PATEL's enforcement of the agreement on behalf of the Suppliers was effective in ensuring that the Suppliers adhered to the terms of the agreement.

31.     As an example, an internal September 2016 Company C email indicates that a Company C executive alerted PATEL to a recent incident of poaching by Company E. PATEL then sent an email to Co-Conspirator 7, referencing Company C and stating: "You had assured me that [Company E] will never soliciting [sic] [Company A]'s long term partners [sic] employees. … Please send me in writing that proper steps has [sic] taken place to curtail this practice." Co-Conspirator 7 revealed, in a subsequent email, that he understood Company C was the source of this complaint: "[Company C] is making a big stink right now over any solicitations." In response to PATEL's reprimand, Co-Conspirator 7 instructed ███████████ ████████ (Individual 5) by email to "[p]lease stop speaking to any [Company C] or other [Company A] supplier companies about transitioning to a [Company E] Office immediately." Individual 5 wrote back "[c]onsider it done." ██████████████████████ ███████████████████████████

32.     ██████████████ provided investigators with a concrete example of how PATEL exercised his authority to keep co-conspirators in line. ██████████████████████ ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████

33.     The investigation has revealed an example of PATEL making such a threat to a co-conspirator Supplier regarding the no-hire/no-recruit rule. A June 2018 series of emails reveals communications between and among PATEL and executives from Company C concerning that company's recent employment offer to an engineer at Company B, about which Company B had complained to PATEL. A recruiter at Company C explained in an internal email, eventually forwarded to Co-Conspirator 5 and other Company C managers and executives, that "[Company B] complained to [Company A] that we are 'stealing' their people, and [Company A] threatened to pull all POs from [Company C] if we hire him." A day later, a Company C employee emailed PATEL and said, "Per our conversation yesterday, this email is to confirm that we have rescinded the offer letter for" that engineer.

34.     Suppliers did not discuss the no-hire/no-recruit restriction only with PATEL. They also communicated directly with each other to confirm their agreement with and mutual adherence to those restrictions. For example, in a September 2019 email between Co-Conspirator 8 and Co-Conspirator 6, after Company F had hired four Company D employees, Co-Conspirator 6 asked Co-Conspirator 8 to stop "actively recruiting" Company D employees. Co-Conspirator 8

agreed, telling Co-Conspirator 6 that Company F's "general aim is NOT to recruit from the local 'competition' because no one wins; salaries rise, the workforce get unstable, and our margins all get hurt." Co-Conspirator 6 replied, thanking Co-Conspirator 8, and adding "I flat out ask our teams not to hire people from the other [Company A] suppliers." ████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████

### PATEL Failed to Heed Warnings that His Conduct was Unlawful

35.     At least as early as January 2016, certain managers and executives at Company C began to discuss the fact that agreements between competitors to restrict recruiting and hiring were unlawful, specifically, because they violate antitrust laws. Early that month, Co-Conspirator 5 was forwarded an email with information about a civil lawsuit involving several major companies accused of (as the Company C employee forwarding the email phrased it) "engaging in illegal anti-poaching agreements......the companies involved had promised each other not to actively recruit employees from one another."

36.     A subsequent email shows that, two days later, Co-Conspirator 5 worked with Individual 1 to plan a meeting with PATEL. One of the agenda items for the PATEL meeting was "Informal poaching agreement between outsource suppliers. Recent Apple lawsuit because these agreements are illegal." ████████████████████████

████████████████████████████████████████

37.     The unlawful nature of no-hire/no-recruit agreements was raised to PATEL's attention yet again in February 2017. As shown in a series of emails, Company C's Human Resources Director spoke to Co-Conspirator 5 about how to respond during an upcoming call with PATEL after a recent allegation that Company C had hired someone from Company B in violation of the agreement. She was concerned, given that "there is an anti-trust issue by us turning people away solely based on their previous employer." In a separate email thread between her and Co-Conspirator 5, among others, Co-Conspirator 5 revealed his concern over the lawfulness of this agreement had not disappeared: "[Company A] (Mahesh Patel) is asking (insisting) that we not interview anyone currently employed by our competitors … I'm not sure if this is legal, but that is what they are requesting we do." The next day, Company C's Human Resources Director reported that she and another Company C manager "spoke with Mahesh this afternoon. He understands our concern with antitrust compliance, however, he still requested that our recruiters not speak with applicants who are current[ly] employed with [Company C] competitors."

38.     One of the individuals who was part of the email thread referred to in the paragraph above was Individual 6. ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ Two weeks later, Individual 6 sent an email to Co-Conspirator 5, the Company C Human Resources Director, and the Vice President of Human Resources. The sole content of the email was a link to a law firm website discussing a class-action antitrust lawsuit alleging a "conspiracy" between a

number of companies who had agreed to "restrict[] recruiting of each other's employees."

████████   ██████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

39.     I have seen no evidence that, after these incidents, PATEL (or his co-conspirators) ceased involvement in the conspiracy. In fact, there is evidence to the contrary, as described throughout this Affidavit.

**Restricting Hiring and Recruiting Between Company A and Company B**

40.     Evidence shows that, as part of the agreement under investigation, PATEL also agreed with employees of Company B to restrict Company A's hiring and recruiting of engineers and other skilled workers from Company B, through two primary means, discussed in turn below.

The Two-Year Tenure Restriction

41.     In 2011, Co-Conspirator 1 and ██████████████████████████ (Individual 1) lobbied PATEL to agree that Company A would not hire Company B's employees until they had worked at Company B for a certain length of time. ██████████████████

████████   ██████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

42.     In September 2011, Co-Conspirator 1 and Individual 1 attended a dinner with PATEL and a Company A Vice President to whom PATEL directly reported to discuss that and other issues. Co-Conspirator 1 sent an email to the dinner group the following day, stating "We truly appreciate and value our strategic relationship. ... I thought I would take the lead in summarizing what we discussed last night and proposed next steps…"  First on that list was "Personnel Transfers" (in quotations in the original email), which Co-Conspirator 1 described as "the new policy/guidelines" that the Company A Vice President had reviewed at the dinner. The new policy related to a "min. 24 months" for such "Personnel Transfers." Co-Conspirator 1 further indicated that PATEL had advised to minimize the written record on that issue: "Following Mahesh's previous counsel, I am not going into detail in writing on this subject."

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████

43.     Beginning in late 2011, from time to time, Co-Conspirator 1 and other managers and executives from Company B communicated with PATEL, and vice versa, in order to reconfirm, maintain, and enforce this agreement and block or attempt to block the recruiting and hiring of certain Company B employees by Company A. While occasionally, these communications went through employees working under PATEL in his outsourcing management group at Company A, as a whole, the evidence shows that PATEL was the central communicator and decision-maker for Company A regarding this agreement.

18

44.     As an example, in October 2012, Individual 1 responded to PATEL by email regarding a Company B employee after receiving a voicemail from PATEL: "[Employee]'s tenure at [Company B] dates to May 2011. Based on our agreement of two year minimum tenure, we would ask that [Company A] not pursue employment of [him] at this time." ██████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

45.     The investigation shows that, even after Individual 1 ████████████, PATEL continued his communications with others at Company B concerning the two-year tenure agreement. As an example, in June 2015, PATEL emailed Co-Conspirator 3 and two other Company B managers, stating that Company A "is interested in interviewing and hiring" two Company B employees, "[p]lease provide your concurrence." One of the Company B managers responded to PATEL that one of the individuals in question had worked at Company B for four and a half years, and thus "meets requirements," but the other "only has 8 months and does not meet obligation, so [Company B] cannot provide concurrence." ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

46.     As another example, in April 2017, a Company B manager noted in an internal email to another Company B manager that he had received a notice from Company A that it

wanted to hire a particular Company B employee, but he "wouldn't meet our requirements for two years." Two days later, the same manager emailed PATEL and stated that the employee "does not meet tenure requirements." PATEL then told a Company A Human Resources employee: "[Company B] will not release him...He has not completed 2 [y]ears as our verbal agreements." ██████████████████████████████

████████████████████████████████████

███████████████████████████████

██████████████████████████████████

██████████████████████

### The Hiring Freezes

47.     In furtherance of the conspiracy, from approximately 2015 through 2017, PATEL and representatives of Company B discussed and agreed upon further restrictions on the hiring and recruiting of Company B employees by Company A, namely by agreeing upon periods of time—ranging from several months to nearly an entire year (2016)—in which Company A would not recruit or hire any Company B employees, with limited exceptions. These periods of time were often referred to as hiring "freezes" or "moratoria."

48.     Each hiring freeze began by Company B managers and executives lobbying PATEL to restrict or cease hiring from Company B. As an example, in September 2015, PATEL emailed three Company B employees, including Co-Conspirator 3, asking for the company's "concurrence" in Company A's hiring of two named Company B engineers. Co-Conspirator 3 responded to PATEL at length, complaining about the recent increase in Company A's hiring. While Co-Conspirator 3 agreed that both of the employees in question "have at least two years [Company B] experience, so [they] meet the 'handshake agreement' level" he stated "[Company

B] will not be able to concur with any more hiring of [Company B] employees this year. … All we can do is highlight the problem and ask that [Company A] support us going forward to prevent further hiring of our resources." In a follow-on email, Co-Conspirator 1 added, addressing PATEL directly, "Mahesh, we truly need your help in blocking these two hires and putting a moratorium on [Company B] hires for the remainder of the year."

49.     As another example, emails show that in January 2016, PATEL and Co-Conspirator 3 were working early in the year to establish a new hiring freeze for 2016. Co-Conspirator 3 reported to Co-Conspirator 4 and another colleague that "I am planning to meet with Mahesh later this week to discuss the hiring matrix I developed to limit the hiring. Also I am going to tell him that he needs to block" two Company B engineers "from being hired until we come to an agreement on the acceptable limit to hire [from] our team." ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████

50.     In addition, emails show that PATEL was the one who announced the beginning of hiring freezes to other Company A personnel involved in recruiting and hiring engineers, and directed them to comply with it. As an example, in an early September 2017 email to the Vice President of Human Resources-Engineering, PATEL requested that she "direct your HR team not to hire [Company B] outsource resources currently deployed on [Company A] projects till end of this year….[Company B] senior leadership including CEO has repeatedly raised concerns on [Company A] hiring [Company B] employees. We will lift [Company B] hiring restriction from Jan 1, 2018."

51.     The investigation has revealed a potential financial quandary that Company B and Company A faced with respect to the latter's hiring from the former: it was difficult for Company B to simultaneously maintain low prices to its customer, Company A, *and* compete with Company A's higher wages. Thus by agreeing to curb Company A's recruiting and hiring from Company B, when otherwise many Company B engineers would be leaving in favor of higher wages and other benefits that Company A offered, PATEL helped alleviate upward pressure on costs to both companies. While Company A and Company B occasionally expressed other reasons for wanting to limit hiring and recruiting between them —e.g., to avoid disruption of engineering projects—the investigation has revealed that the existence and continuation of the conspiracy lessened the pressure on Company B to better compete with Company A on wages, benefits, and professional opportunities.

52.     Consistent with this shared interest, as part of Company B's lobbying of PATEL to agree to the hiring freezes, Company B appealed to the financial benefits that would accrue to both Company B and Company A if Company A ceased recruiting and hiring Company B engineers, including by resisting wage increases. As an example, in June 2017, Company B's President, Co-Conspirator 1, made a business proposal to the parent company of Company A, which was forwarded to PATEL and, as Co-Conspirator 1 noted in his cover email, would be discussed with PATEL and others during upcoming negotiations. The proposal, as Co-Conspirator 1 explained, provided a "partnership approach on how we can minimize bill rate increases necessary to hire and retain resources needed to provide the desired services to" Company A's parent company. In the attached presentation, Co-Conspirator 1 explicitly requested further hiring restrictions between the two companies, given that "We have found that

customer hiring of our resources puts pressure on [Company B]'s and our customers' ability to contain labor cost increases in our joint 'ecosystem' over time."

<u>Affected Individuals</u>

53.     Through my review of documentary evidence as well as conducting witness interviews, I have identified several individuals, in addition to the ones discussed in more detail above, who were engineers or other skilled workers who were denied jobs at Company A or a co-conspirator Supplier as a result of the agreement described in Paragraph 11 above.

54.     While the investigation has revealed that some workers were indeed able to obtain new jobs at Company A or competing Suppliers, and thus not *all* recruiting and hiring ceased between the co-conspirators during the relevant period, the investigation has found thus far that the no-hire/no-recruit agreement had a demonstrable impact. Certain individuals were directly affected, in that they applied for new positions outside their company (or had been identified by the new employer as someone to be recruited for a new position), but were blocked from obtaining that new employment due to the no-hire/no-recruit agreement. More generally, this agreement discouraged some workers from even attempting to find new employment, based on their knowledge of or rumors of the no-hire/no-recruit agreement. Some victim-witnesses recounted the personal toll that this took on their lives, emotionally, professionally, or financially. In addition, we have found, in many instances, that victim-witnesses were unaware of the actions taken by PATEL and co-conspirators to block their job applications that have been otherwise revealed by documentary evidence and other witnesses' statements.

<u>Trade and Commerce</u>

55.     Collectively, Companies A–F employed engineers and other skilled labor workers in various states across the United States, including Connecticut, Vermont, Massachusetts, Illinois, Ohio, Georgia, and Florida, and their agreement restricted interstate movement of such

23

workers between those various states within the relevant market for labor. ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

<u>Conclusion</u>

56.     Based upon the information contained within this Affidavit, I believe there is

probable cause that PATEL has violated Title 15, United States Code, Section 1 (conspiracy in

restraint of trade). Accordingly, I respectfully request that the Court issue a warrant for the arrest

of PATEL.

MEHRING.CHRISTOPHE
R.MICHAEL.1255909890

Digitally signed by
MEHRING.CHRISTOPHER.MICHAEL.12
55909890
Date: 2021.12 06 12:52:58 -05'00'

SPECIAL AGENT CHRISTOPHER MEHRING
DEFENSE CRIMINAL INVESTIGATIVE
SERVICE
U.S. DEPARTMENT OF DEFENSE


The truth of the foregoing affidavit has been attested to me by Special Agent Christopher

Mehring over the telephone on this _____6_____ day of December 2021, at Hartford, Connecticut.

Robert A.
Richardson

Digitally signed by Robert A. Richardson
Date: 2021.12 06 17 31:16 -05'00'

HONORABLE ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE